REL:  December 1, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2023-2024

—————————————————

## CL-2023-0033, CL-2023-0034, CL-2023-0035, and CL-2023-0036

—————————————————

### T.D.H.

### v.

### Mobile County Department of Human Resources

### Appeals from Mobile Juvenile Court
### (JU-18-1197.02, JU-18-1196.02, JU-18-1195.02, and JU-18-1192.02)

—————————————————

### CL-2023-0057 and CL-2023-0058

—————————————————

### J.M.S.

### v.

### Mobile County Department of Human Resources

### Appeals from Mobile Juvenile Court)
### (JU-18-1195.02 and JU-18-1197.02)

CL-2023-0033; CL-2023-0034; CL-2023-0035; CL-2023-0036; CL-2023-0057; and CL-2023-0058

EDWARDS, Judge.

In October 2019, the Mobile County Department of Human Resources ("DHR") filed petitions in the Mobile Juvenile Court ("the juvenile court") seeking to terminate the parental rights of T.D.H. ("the mother") and J.M.S. to four children: C.S., D.S., J.S., and M.S.; those petitions were assigned case numbers JU-18-1192.02, JU-18-1195.02, JU-18-1196.02, and JU-18-1197.02, respectively. DHR later amended its petitions in case numbers JU-18-1192.02 and JU-18-1196.02, relating to C.S. and J.S., to dismiss J.M.S. as a party because genetic testing had established that he was not the father of either C.S. or J.S. DHR added A.R. as a defendant in case number JU-18-1192.02 and C.L.J. as a defendant in case number JU-18-1196.02. J.M.S. ("the father") remained a party in case numbers JU-18-1195.02 and JU-18-1197.02.

After several continuances, the actions, which had been consolidated for trial, were tried on October 13, 2022. After the conclusion of the trial, the juvenile court accepted a December 2022 posttrial filing from the mother, as had been agreed upon at trial. On January 15, 2023, the juvenile court entered judgments terminating the

CL-2023-0033; CL-2023-0034; CL-2023-0035; CL-2023-0036; CL-2023-0057; and CL-2023-0058

parental rights of the mother to C.S., D.S., J.S., and M.S. and terminating the parental rights of the father to D.S. and M.S. The judgments entered in case numbers JU-18-1192.02 and JU-18-1196.02 did not terminate the rights of A.R. or of C.L.J., respectively. Both the mother and the father appeal.[1]

## I. The Mother's Appeals in Appeal Numbers CL-2023-0034 and CL-2023-0036

Before we may consider the arguments of the mother in appeal numbers CL-2023-0034 and CL-2023-0036, we must first consider whether this court has jurisdiction over those appeals.

> "Although none of the parties has raised the issue whether this court may consider [these] appeals, 'matters of jurisdiction are of such importance that a court may consider

---

[1]The mother's appeal from the judgment entered in case number JU-18-1192.02 was assigned appeal number CL-2023-0036; the mother's appeal from the judgment entered in case number JU-18-1195.02 was assigned appeal number CL-2023-0035; the mother's appeal from the judgment entered in case number JU-18-1196.02 was assigned appeal number CL-2023-0034; and the mother's appeal from the judgment entered in case number JU-18-1197.02 was assigned appeal number CL-2023-0033. The father's appeal from the judgment entered in case number JU-18-1195.02 was assigned appeal number CL-2023-0057, and the father's appeal from the judgment entered in case number JU-18-1197.02 was assigned appeal number CL-2023-0058. This court consolidated the appeals ex mero motu.

3

them ex mero motu.' Reid v. Reid, 844 So. 2d 1212, 1214 (Ala. Civ. App. 2002).

"'"'It is a well established rule that, with limited exceptions, an appeal will lie only from a final judgment which determines the issues before the court and ascertains and declares the rights of the parties involved.'" Owens v. Owens, 739 So. 2d 511, 513 (Ala. Civ. App. 1999), quoting Taylor v. Taylor, 398 So. 2d 267, 269 (Ala. 1981). This court has stated:

"'"A final judgment is one that completely adjudicates all matters in controversy between all the parties.

"'"... An order that does not dispose of all claims or determine the rights and liabilities of all the parties to an action is not a final judgment."'"

D.L. v. Calhoun Cnty. Dep't of Hum. Res., 276 So. 3d 227, 230 (Ala. Civ. App. 2018) (quoting Adams v. NaphCare, Inc., 869 So. 2d 1179, 1181 (Ala. Civ. App. 2003), quoting in turn Eubanks v. McCollum, 828 So. 2d 935, 937 (Ala. Civ. App. 2002)).

As explained previously, DHR requested that the father be dismissed as a party in case numbers JU-18-1192.02 and JU-18-1196.02 because genetic testing had excluded him from being the biological father

CL-2023-0033; CL-2023-0034; CL-2023-0035; CL-2023-0036; CL-2023-0057; and CL-2023-0058

of C.S. and J.S.  DHR then requested that A.R. be named as a defendant in case number JU-18-1192.02, relating to C.S., and that C.L.J. be named as a defendant in case number JU-18-1196.02, relating to J.S.  Both A.R. and C.L.J. were served by publication.  The judgments entered by the juvenile court in case numbers JU-18-1192.02 and JU-18-1196.02 fail to address the requests by DHR that the parental rights of A.R. and C.L.J. be terminated.

In its letter brief on the issue of this court's jurisdiction over appeal numbers CL-2023-0034 and CL-2023-0036, DHR posits that, because A.R. and C.L.J. are only alleged fathers and not legal fathers of C.S. and J.S., the juvenile court was without statutory authority to terminate their parental rights.  See J.R.C. v. Mobile Cnty. Dep't of Hum. Res., 342 So. 3d 580 (Ala. Civ. App 2021) (determining that a juvenile court lacks statutory authority to terminate the parental rights of a man who has not been determined to be the legal father of a child).  Although we agree with DHR that the juvenile court lacked the statutory authority to terminate the parental rights of A.R. and C.L.J. because the juvenile court had not yet adjudicated their paternity of C.S. and J.S.,

5

CL-2023-0033; CL-2023-0034; CL-2023-0035; CL-2023-0036; CL-2023-0057; and CL-2023-0058

respectively, DHR fails to recognize that the claim it asserted against each man <u>remains unadjudicated in the juvenile court</u>. Had the juvenile court determined that A.R. and C.L.J. were not legal fathers, had the juvenile court denied DHR's petitions insofar as they sought to terminate the parental rights of A.R. and C.L.J., or had the juvenile court dismissed A.R. and C.L.J. from the actions because their parental rights could not be terminated without an adjudication of paternity, these appeals could have proceeded; certainly, had the juvenile court adjudicated the paternity of A.R. and C.L.J. and terminated their parental rights, the judgments would be final and capable of supporting these appeals. However, the judgments entered in case numbers JU-18-1192.02 and JU-18-1196.02 do not mention A.R. or C.L.J. or the termination-of-parental-rights claims that DHR asserted against each of them, and those judgments, which do not adjudicate the rights and liabilities of all the parties before the juvenile court, are therefore not final judgments. Thus, we dismiss the mother's appeals in appeal numbers CL-2023-0034 and CL-2023-0036.

6

CL-2023-0033; CL-2023-0034; CL-2023-0035; CL-2023-0036; CL-2023-0057; and CL-2023-0058

## II. The Mother's Appeals in Appeal Numbers CL-2023-0033 and CL-2023-0035

### A. Facts and Procedural History

Turning now to the mother's appeals in appeal numbers CL-2023-0033 and CL-2023-0035, the record indicates that D.S. and M.S. ("the children") were first removed from the custody of the mother and the father, who were never married, in August 2018. Latonya Ankerson, who was the investigator assigned by DHR to investigate the report made against the mother and the father, testified that the report that DHR had received indicated that the mother and the father had used illegal drugs in the presence of the children; that the mother may have physically abused D.S., resulting in his suffering a seizure; that the children may have been exposed to sexual abuse by a person who had visited the mother and the father; and that the mother had threatened to kill herself and the children. Ankerson testified that she had interviewed the mother's oldest child, C.S., at school, and that she had then visited the mother and D.S. in the hospital, where D.S. was being treated for the seizure. According to Ankerson, when she arrived at D.S.'s hospital

room, the mother was asleep on a small couch in the room. Although Ankerson indicated that the mother had not been easily awakened and that she had sought the assistance of a nurse in awakening her, she also testified that the mother had awoken about one and a half minutes after Ankerson's arrival.

Ankerson described the mother as being irate. Ankerson said that the mother had used profanity and had yanked out some of her own hair when Ankerson informed her that she would need to submit to a drug test. Ankerson said that she had explained to the mother that DHR would first require a urine test, at which point, Ankerson testified, the mother had pulled down her pants and told Ankerson that she could "get the piss up off the floor." Ankerson said that she had requested that security be called to the room because of the mother's attitude and behavior.

Ankerson testified that the presence of a security guard had only escalated the mother's irate behavior. Ankerson explained that the mother had telephoned her own mother, L.H. ("the maternal grandmother"), and demanded, in a profanity-laced conversation, that

she come to the hospital. After the maternal grandmother arrived, Ankerson was able to calm the mother enough to discuss the situation with her.

Ankerson recalled that the mother had explained that she did not know where C.S., J.S., and M.S. were and that the mother had said that she had been unable to reach anyone to inquire regarding their whereabouts. Ankerson said that the mother had visible bruising but that the mother had refused to explain the cause of those bruises and had told Ankerson that Ankerson did not need to know. Additionally, Ankerson testified that the mother had denied drug use.

According to Ankerson, after she left the hospital, she went to the family's residence, where she located C.S., J.S., and M.S. She testified that C.S. was staying with the mother's sister, J.H. ("the maternal aunt"), who lived down the street. Apparently, J.S. and M.S. were being supervised by a man who said that he had met the family a few times and that he was being paid to watch those children and by a woman who said that she had offered to assist the mother by watching those children.

9

Ankerson described the family's home as a mobile home with bare plywood floors, holes in some of the walls and doors, and very little food.

Ankerson explained that DHR had entered into a safety-plan arrangement for C.S. and D.S., under which they would reside with the maternal aunt; Ankerson said that the safety plan had prohibited C.S. and D.S. from having unsupervised contact with the mother. Ankerson said that J.S. and M.S. had been permitted to reside with the mother at an inpatient drug-rehabilitation facility. However, Ankerson reported, the mother soon left that facility and had had unsupervised contact with C.S. and D.S., prompting DHR to file dependency petitions seeking an award of custody of the children.

Ankerson testified that she had informed the mother that she had tested positive for methamphetamine, amphetamines, and marijuana on a urine test, to which the mother had submitted on August 10, 2018. Ankerson said that the father had contacted her a few days after Ankerson's initial contact with the mother; she said that, when she had told him that DHR would like him to submit to a drug test, he had informed her that he would test positive for any substances for which the

10

mother had tested positive because they were using the same illegal substances. According to Ankerson, based upon her investigation, DHR had determined that the mother and the father were "indicated" for "physical harm" and "other risk of serious harm" based upon their being positive for methamphetamine and other illegal substances.

Lakailyn Christian testified that she had been the family's caseworker from July 2019 to November 2021. Christian said that the mother had been "open and honest" with her about her desire to secure sobriety in a conversation in July 2019. According to Christian, the mother had indicated that the father had introduced her to drugs, that the father was her "trigger," and that she was choosing to stay away from the father. Christian testified that the mother had been hesitant to discuss the father and had not provided contact information for him, despite being requested to do so. Like Ankerson, Christian visited the mother's home, which she described as requiring some maintenance and repairs to appliances, including the stove.

According to Christian, she had usually discussed the mother's case plan with her over the telephone. She testified that she had discussed

11

with the mother services that DHR could offer her, like drug testing, parenting classes, and anger-management classes. She indicated that the mother had produced documentation indicating that she regularly attended Narcotics Anonymous meetings. Christian described the mother as having been only partly receptive to services, noting specifically that Christian had thought that the mother was not as receptive as she could have been to the counseling offered to her by DHR.

Regarding the counseling offered to the mother by DHR, Christian testified that DHR had provided the mother individual counseling with Amy Turner. Turner's records are contained in the record on appeal. Those records indicate that, beginning in August 2019, the mother had participated in five monthly sessions with Turner, one of which, according to the notes, consisted solely of a random drug screen. Turner documented the mother's impulse- and anger-control issues and discharged her from counseling in December 2019, indicating that the mother was not addressing her impulse- and anger-control issues despite being aware of those issues. Turner's notes reflected that the mother had expressed displeasure with Christian, had used racial slurs in describing

12

Christian, and had stated that she hoped that Christian and her infant child would die. Christian testified that, after the mother's counseling sessions with Turner were terminated, the mother had not appeared to be receptive to the idea of counseling. Christian admitted, however, that, although she recalled discussing certain options with the mother, she was not certain whether she had referred the mother to another counselor.

Christian testified that the mother had regularly submitted to drug tests. Although the record is devoid of the results of the mother's drug tests taken during Christian's tenure as caseworker, Christian explained that the mother had tested positive at times and had been upset to learn of positive results. Christian said that the mother had requested to have her own testing performed, which DHR had permitted, but that the results of at least one of those tests had also been positive. According to Christian, the mother had not admitted drug use even when confronted with positive test results. Christian also indicated that the mother had been in and out of jail during her tenure as caseworker.

According to Christian, she had regularly supervised the mother's visits with the children. She then recounted an odd encounter with the

mother after a visitation in November 2019. According to Christian, she had been discussing with the mother her case plan and asking her about her support system when the mother began crying "uncontrollably" and pulling at her own hair. During that conversation, Christian explained, the mother received a telephone call from an employee at the Subway restaurant where the mother was employed at the time. Christian said that the mother stopped crying, had a calm conversation with the caller, and then resumed crying after she ended the telephone conversation. Christian testified that she had then asked the mother to calm down so that they could continue to discuss her case plan but that the mother had gotten up and stormed into the hallway.

Christian said that, based upon the mother's behavior at that November 2019 meeting, DHR had imposed restrictions on the mother. She said that the mother was required to be off DHR's premises by 4:30 p.m., that the mother had to telephone in advance and make an appointment to see Christian, that any such appointment had to be scheduled before 3:00 p.m., and that the mother's visitations with the children had to be supervised by both Christian and a security guard.

14

CL-2023-0033; CL-2023-0034; CL-2023-0035; CL-2023-0036; CL-2023-0057; and CL-2023-0058

Christian admitted that the presence of a security guard during visitations had made the children uncomfortable, so, she said, DHR had decided that, instead, a DHR supervisor must attend each visit.

Regarding the father, Christian testified that her first contact with him had been by telephone in May 2020. Christian said that she had obtained the father's telephone number from his attorney and that she had initiated the contact. She described their conversation as "open and honest" and said that the father had admitted that he had not been an active participant since the children had been placed in foster care in August 2018. Although Christian testified that she had informed the father that DHR required him to submit to a drug test, she said that he had not submitted to any drug testing during her tenure as caseworker, which ended in November 2021. Christian further testified that she had not performed a home visit on the father's residence because, she said, he had informed her that he was living with another person and, as far as she was informed, that person had never agreed to allow DHR to visit the residence.

Christian said that the father had attended the mother's visit with the children the week following her initial telephone contact with him, which, she had said, was in May 2020. According to Christian, the children had been excited to see the father and he had been excited to see them. However, Christian also testified that the father had not visited the children on his own even once between July 2019 and May 2021, after which, she said, he had visited the children only twice before November 2021. Thus, the record reflects that the father visited the children only three times between their removal from the home in August 2018 and November 2021.

Christian also testified that she had sought potential relative resources for the children by performing what she described as "Seneca" searches. Copies of those search results appear in the record on appeal. Christian said that she had contacted those persons located by the Seneca searches by mail about serving as resources for the children but that none of those persons had responded to the letters she had sent. According to Christian, the maternal grandmother had been rejected as a potential resource by DHR because of her history with DHR and her drug use.

16

Similarly, Christian explained that the maternal aunt had been rejected as a potential resource because she had failed to prevent C.S. and D.S. from having contact with the mother during the pendency of the safety plan. The children's maternal grandfather, Je.H., had been rejected as a resource because he was a registered sex offender.

According to Christian, termination of parental rights and adoption was the appropriate plan to ensure permanency for the children. Regarding M.S., Christian testified that she had disrupted several foster-care placements because of her unspecified behaviors, that she had recently been diagnosed with attention-deficit/hyperactivity disorder ("ADHD"), and that she had been placed in a therapeutic foster-care placement only two months before trial. Although Christian said that M.S. was doing well in her current placement, she admitted that DHR was still assessing whether the new foster parents would be willing to commit to serving as an adoptive resource for M.S. When asked how termination of parental rights would secure permanency for D.S., Christian answered:

17

> "We have referred them to State DHR which is our adoption consultant, and we have started looking for adoptive resources for the children pending that they're legally free for adoption. We also look for legal risk placements should we [have to] wait for the [termination of parental rights] to be finalized to find an adoptive resource for the children."

Vera Evans, the family's caseworker at the time of the trial, testified that she had begun her tenure as caseworker in November 2021. Evans explained that the mother had had hour-long visits with the children at DHR's offices on the third Thursday of each month. She said that the father had sometimes attended those visits with the mother. She said that her recollection was that the father had visited with the children "maybe four" times since November 2021, and, when asked whether the father had attended 100% or 50% of the visits, she stated that he had attended an "in between" percentage of the visits. She also testified that the father had sometimes been late to the visits he had attended. When questioned about whether the children had regular contact with each other, Evans indicated that the children saw each other at the monthly visits and that the foster parents did "get together and let the children visit with one another" as often as "once a week or every

other week on the weekends," depending on the activities and schedules of the children.

Although Evans first testified that M.S.'s foster parents desired to adopt her, she recanted that testimony later, indicating instead that no decision to pursue adoption had been made by M.S.'s current foster parents, who Evans admitted had served as foster parents for 24 years; when asked whether those foster parents had ever adopted a child, Evans indicated that she was "not aware of that." She also testified that the permanency plan for D.S. was adoption with no identified resource. Evans noted that M.S. suffered from ADHD and that D.S. was autistic and suffered from a seizure disorder.

Regarding the circumstances of the father, Evans testified that she had not visited his residence. In fact, she stated that she did not have the father's address. She indicated that the father had a good relationship with the children based on her observation of them during visits. She said that she had requested that the father undergo a drug test only once during her tenure as a caseworker and that the father had not submitted to that test.

CL-2023-0033; CL-2023-0034; CL-2023-0035; CL-2023-0036; CL-2023-0057; and CL-2023-0058

The mother testified that she had been enrolled in an inpatient drug-treatment program at The Lovelady Center since March 3, 2022. She admitted that she had enrolled in that program because she had been ordered by a court to do so or face imprisonment relating to her March 2021 convictions for assault in the first degree, burglary in the third degree, and intimidating a witness. According to the mother's testimony and documentary evidence in the record, the mother had been sentenced to five years of incarceration for those convictions, but her sentences had been "split," she had been credited with time served in jail, and she had been placed on probation for a term of three years. The mother admitted that she had violated the terms of her probation and that her probation had been revoked, resulting in her compulsory enrollment in the drug-treatment program at The Lovelady Center; DHR did not dispute the mother's testimony regarding the revocation of her probation.

The mother discussed the circumstances of her various arrests. She explained that the assault conviction had resulted from her discharging a firearm. According to the mother, on the date of that incident, her boyfriend, S.B. ("the boyfriend"), was driving her vehicle, and she was a

20

passenger. She said that two other men, H.B. and Ch.S., were also in the vehicle and that the group had done drugs together. She said that H.B. had requested that the boyfriend stop at a car wash, where H.B. got out of the vehicle and confronted C.Y., a man unknown to the mother at that time. The mother recalled that the two men had exchanged words and had engaged in a physical altercation, during which C.Y. pulled out a gun, after which H.B., who was also armed with a gun, shot C.Y. four times. The mother testified that, during the exchange of gunfire, she had remained in the vehicle, but she admitted that she had fired a gun, shooting in the general direction of C.Y., and that her bullets had struck a truck and not C.Y.

The mother described the facts surrounding her burglary conviction by stating that she had not actually engaged in the act of burglary but that she had had the boyfriend perform the actual act of burglary while she had remained in her vehicle in the parking lot of the Subway restaurant at which she had previously worked. The mother explained that she had been upset because Subway had not relinquished her last paycheck to her and that her anger had prompted her to act to take what

she was owed. The mother denied that she had intimidated a witness relating to the burglary after she had been released on bail on the burglary charge, but she pleaded guilty to that charge.

The mother admitted that she had previously completed a drug-rehabilitation program at Home of Grace in 2019 but that she had relapsed. She also testified that she had begun drug-rehabilitation programs at Haven of Hope in 2018 and at Altapointe at an unspecified date but had not completed either. She admitted that she had not completed counseling with Turner. She said that she had consistently attended Narcotics Anonymous and/or Alcoholics Anonymous meetings.

Although the mother admitted that she had been using illegal drugs at the time the children were removed from her custody, she insisted that she had not used illegal substances in 2020. She said that she had remained clean for quite some time after completing a drug-rehabilitation program at Home of Grace in 2019. She admitted that she had relapsed in or around October 2021. She also admitted that she had tested positive on drug tests for DHR and on those she had procured for herself in 2020, but she insisted that the results of those tests were

incorrect. She testified that she had not tested positive for any illegal substances while at The Lovelady Center.

The mother testified that she was doing well at The Lovelady Center and that she was due to graduate from its drug-treatment program in November 2022. She explained that she had learned to take ownership of her actions and that she knew that the predicament she was in with the children was of her own making. She said that she planned to stay at The Lovelady Center and participate in the aftercare program there upon her graduation. She said that the children would be able to live with her and attend an onsite school while she worked in the thrift store and participated in classes and continued therapy. The mother testified that she was working to complete her GED and that she hoped to be able to take college courses in business management in the future.

According to the mother, she had completed at least three anger-management courses since the removal of the children in August 2018. However, as noted above, Turner had indicated in 2019 that the mother was aware of her anger-management issues but was not willing to address them. In addition, the mother admitted that she had recently

23

CL-2023-0033; CL-2023-0034; CL-2023-0035; CL-2023-0036; CL-2023-0057; and CL-2023-0058

expressed frustration by using profanity in a discussion with the father at the DHR offices when the children were late for their scheduled one-hour of visitation.

The mother also admitted that she had remained involved with the boyfriend until August 2022, even inviting him to attend M.S.'s birthday party that month. The mother said that she had maintained her relationship with the boyfriend because she had thought that he was also undergoing drug rehabilitation, but, she said, she had learned at the birthday party that he had left his inpatient drug-rehabilitation facility. According to the mother, she ended her relationship with the boyfriend at that time.[2]

According to the mother, she had not missed a visitation with the children since she began treatment at The Lovelady Center. She explained that her visits were held on every third Thursday of the month

_____

[2]The mother testified that she had thought that she and the boyfriend had married each other in early 2022 when they were both incarcerated in the Mobile County jail. However, she testified that she had since learned that the paperwork evidencing their marriage had never been filed and that they were not actually married.

24

for one hour. The mother indicated that, at times, not all of the children attended the visits. She stated that she was entitled to telephone visits with the children every other Sunday, but, she said, she never received telephone calls from D.S.; she testified that M.S. telephoned her regularly. She said that she had complained to her caseworkers about the lack of telephone visitation with D.S. and that the caseworkers had indicated that they would speak to the foster parents, but, she said, nothing had changed.

Joanne Henry, a client representative from The Lovelady Center, testified that the mother was one of her clients. She explained that the mother had progressed through the phases of the program and was, at the time of trial, in phase five, the final phase before graduation from the program. She testified that, although the mother had been withdrawn and very angry when she first arrived at The Lovelady Center, the mother had worked through the program and had taken ownership of her part in creating her circumstances. Henry said that the mother had a great work ethic and that she could always be found where she was supposed to be and doing what she was supposed to be doing. Like the

25

mother, Henry testified that The Lovelady Center provided aftercare to clients after graduation from the program, which included assistance with housing, employment, and random drug testing. Henry further explained that The Lovelady Center would accommodate any court-ordered requirements or stipulations that might be placed on a client, including offering family therapy or more frequent drug testing.

Catalina Arata, Ph.D., testified that she was a clinical psychologist who had performed a psychological evaluation on the mother in September 2022. Arata summarized some of the family history that the mother had provided to her, which included the mother's being sexually abused by a grandfather; having a relationship with the maternal grandfather, who could not live in the home because he was a registered sex offender; having been emotionally abused by the maternal grandmother, who abused drugs; having been removed from the custody of the maternal grandmother by DHR; having been placed both in foster care and in a group home during the period of DHR's involvement; having been returned to the custody of the maternal grandmother at some point; and becoming pregnant at age 15 (presumably with C.S.) following a

26

relationship with a man who was over age 20. She said that the mother had indicated that she had first used drugs while in middle school and that the mother had completed the eighth grade but had not returned to school after the birth of C.S. Arata indicated that the mother was not a good historian and that, at times, her dates "did not add up," but she said that she had believed that the mother had been honest with her during the evaluation.

According to Arata, the mother suffered from some depression but not at a clinical level. She indicated that the mother's depression was typical of those facing similar life situations. Arata also testified that testing had revealed that the mother showed no real indications that she faced a significant risk of physically abusing the children.

When asked about the mother's attitude, Arata stated that the mother had acknowledged that she had displayed significant anger and had acted inappropriately toward DHR personnel at the outset of DHR's involvement with the family. Arata testified that the mother had revealed that she had been led by her mother to believe that her brother, who had committed suicide during the period he and the mother had been

27

in DHR's custody, had been killed by his foster family, which, Arata said, had led to the mother's having severe mistrust of DHR. Arata admitted that the mother had significant issues with anger but said that the mother had improved her self-control. Arata further testified that she believed that the mother was making a sincere attempt to change and that her efforts had been largely successful, if not entirely complete.

Arata further opined that the mother suffered from untreated ADHD and that she would benefit from a psychiatric evaluation and treatment to assist her with her ADHD and perhaps to support her efforts to change with medications like mood stabilizers. Arata suggested that the mother would need continued counseling to assist her with maintaining her sobriety. She said that the mother had a good work ethic and solid functional living skills but also indicated that the mother might benefit from a vocational-rehabilitation assessment and services to assist her with gaining financial security. When asked about the mother's likelihood of relapse, Arata testified that the mother faced a mild to moderate risk of relapse if she were able to maintain stable employment

and housing but that her risk of relapse would increase if she were unable to maintain security in those aspects.

Arata opined that the mother was not yet capable of parenting the children on her own. She noted that the mother's situation, which was living in a drug-rehabilitation facility, was more transitional and not a truly stable living circumstance. She indicated that her recommendation for the mother would be to complete the program at The Lovelady Center, to remain in the aftercare program for at least one year, to continue with individual therapy, and to seek a psychiatric evaluation and possible psychiatric treatment. Thus, Arata indicated that the mother would not be sufficiently capable of assuming the role of a parent to the children for at least another 13 months after the trial.

When questioned about the children, whom she had not evaluated or even met, Arata opined that the children should be permitted to maintain contact with one another. She also testified that the children's bonds with their foster parents should be considered when evaluating the termination of parental rights. She stated that "the younger they were … when they were placed [in a foster-care placement], that is certainly

the bond they've been with the foster parent more than they've been with their biological parent, that would be an issue … I think that has to be considered."

The father testified only briefly. He stated that he is the father of the children. He testified that he rents a three-bedroom home with ample room for the children. The father said that he had been employed as a tow-truck driver with a towing company for one year, that he worked Monday through Friday from 7:00 a.m. to 5:00 p.m., and that he was on call every other weekend.

He admitted that he had been incarcerated in 2020 on a theft-of-property conviction and that he had completed his sentence of incarceration on April 5, 2021; he said that he was still on probation following his release from incarceration. According to the father, he regularly submits to drug tests as a term of his probation and also submits to random drug tests as a condition of his employment. He said that his drug-test results had been negative. He testified that he had not used drugs in over two years.

Although the father initially testified that he had not been provided services by DHR, when questioned more specifically about whether DHR had offered him parenting classes and anger-management classes, he indicated that those services had been offered but that he had not taken any classes. When asked why he had not taken the drug test requested by Evans, the father said that he had intended to take the test but that he had been called to work and could not go to the testing site. He admitted that he had not contacted Evans to explain the situation or to reschedule the drug test.

The father testified that he had a bond with the children, but he did not testify regarding the frequency or paucity of his visits with them. He said that he could support the children financially without assistance from the mother. He also said that his ex-wife could assist him with the children when he had to work.

## B. Standard of Review

The termination of parental rights is governed by Ala. Code 1975, § 12-15-319. That statute reads, in part:

31

"(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parent[] of a child [is] unable or unwilling to discharge [his or her] responsibilities to and for the child, or that the conduct or condition of the parent[] renders [him or her] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parent[]. In a hearing on a petition for termination of parental rights, the court shall consider the best interest of the child. In determining whether or not the parent[] [is] unable or unwilling to discharge [his or her] responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:

"….

"(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for the needs of the child.

"….

"(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parent[] have failed.

"….

"(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child

32

in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.

"(13) The existence of any significant emotional ties that have developed between the child and his or her current foster parent or parents, with additional consideration given to the following factors:

"a. The length of time that the child has lived in a stable and satisfactory environment.

"b. Whether severing the ties between the child and his or her current foster parent or parents is contrary to the best interest of the child.

"c. Whether the juvenile court has found at least one other ground for termination of parental rights."

The test a juvenile court must apply in a termination-of-parental-rights action is well settled:

"A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and

reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So. 2d 950, 954 (Ala. 1990)."

B.M. v. State, 895 So. 2d 319, 331 (Ala. Civ. App. 2004). A juvenile court's judgment terminating parental rights must be supported by clear and convincing evidence. P.S. v. Jefferson Cnty. Dep't of Hum. Res., 143 So. 3d 792, 795 (Ala. Civ. App. 2013). "Clear and convincing evidence" is "'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002) (quoting Ala. Code 1975, § 6-11-20(b)(4)). Although a juvenile court's factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct, K.P. v. Etowah Cnty. Dep't of Hum. Res., 43 So. 3d 602, 605 (Ala. Civ. App. 2010), "[t]his court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing." K.S.B. v. M.C.B., 219 So. 3d 650, 653 (Ala. Civ. App. 2016). That is, this court

34

> "'must ... look through ["the prism of the substantive evidentiary burden," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986),] to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would "produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion."'"

K.S.B., 219 So. 3d at 653 (quoting Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008), quoting in turn Ala. Code 1975, § 25-5-81(c)).

## C. Analysis

The mother argues that DHR failed to establish that no viable alternative to the termination of her parental rights existed or that termination of parental rights was in the best interest of the children. The mother contends that maintaining the status quo was a viable alternative under the circumstances. She also relies on this court's recent opinion in T.W. v. Calhoun County Department of Human Resources, [Ms. CL-2022-0694, June 2, 2023] ___ So. 3d ___ (Ala. Civ. App. 2023), to support her argument that DHR failed to establish that the children would achieve permanency through termination of her parental rights. In addition, the mother also argues briefly that DHR did

not establish that the mother's conduct or condition prevented her from discharging her parental responsibilities or that her conduct or condition was unlikely to change in the foreseeable future. See Ala. Code 1975, § 12-15-319(a).

We first consider the mother's argument that the evidence before the juvenile court did not clearly and convincingly establish that she was unable or unwilling to properly parent the children and would remain so for the foreseeable future. The mother contends that the evidence indicated that she was working to address her addiction to illegal substances and complying with an order issued by the court that had sentenced her on her criminal convictions by completing inpatient drug treatment at The Lovelady Center. Although we agree that the mother's participation in the program at The Lovelady Center and her incarceration in the months immediately preceding her enrollment in that program had resulted in the mother's refraining from the use of illegal substances for approximately 10 months as of the date of the trial, the mother was attending that program to avoid further incarceration. We commend the mother for her apparent dedication to the program, but

the juvenile court was not required to determine that the mother's participation in her most recent drug-rehabilitation program had resolved the issues that had prevented her from effectively discharging her parental responsibilities to and for the children.

At the time of the trial, the mother had not yet completed the program at The Lovelady Center, but she was expected to graduate in November 2022. In addition, the mother's own witness, Arata, indicated that the mother's need to graduate from the program was not the only impediment to her resuming her role as a parent to the children. Arata testified that the mother was not yet capable of resuming her parental role and opined that the mother would need to not only complete the inpatient program at The Lovelady Center but also participate in at least one year of structured aftercare before she might be ready to resume custody of her children.

We have explained that a parent's attempt to remedy the conduct or condition that prevents him or her from being an adequate parent should be accomplished in a timely fashion. Talladega Cnty. Dep't of Hum. Res. v. M.E.P., 975 So. 2d 370, 374 (Ala. Civ. App. 2007) (expressing

the oft-stated principle "that there is a point at which the child's need for permanency and stability will overcome the parent's rights to rehabilitation by DHR").  In fact, typically, a parent should rehabilitate himself or herself within 12 months of the removal of the child or children from the home.  M.A.J. v. S.F., 994 So. 2d 280, 291 (Ala. Civ. App. 2008) (explaining that, "when DHR timely exerts reasonable rehabilitation and reunification efforts, the parents generally shall have 12 months from the date the child enters foster care to prove that their conduct, condition, or circumstances have improved so that reunification may be promptly achieved").  The juvenile court was free to give weight to the fact that the children had been in DHR's custody since August 2018, a period exceeding four years at the time of the trial.

Despite the mother's active participation in the program at The Lovelady Center and its positive influence on her, the record contains sufficient evidence to support the juvenile court's conclusion that the mother was unable to properly discharge her parental responsibilities to and for the children and that the mother's condition, although improving, was unlikely to change in the foreseeable future.  As we have explained,

> "[d]ue to the emphasis on prompt permanent disposition of children in foster care, the juvenile courts should only extend the period of rehabilitation when the evidence establishes that a <u>limited additional amount of time or effort</u> will necessarily result in the rehabilitation of the parent and accomplishment of the goal of family reunification …."

<u>M.A.J.</u>, 994 So. 2d at 291 (emphasis added). The children had been in the custody of DHR and in foster care for over four years at the time of the trial. The mother's most recent attempt to conquer her addiction began in March 2022, over three and a half years after the children were removed from her custody. Arata's testimony indicates that the mother's completion of the program at The Lovelady Center would not alone rectify the mother's inability to parent the children; instead, Arata recommended that the mother participate in at least one additional year of aftercare, together with continued counseling and potential psychiatric treatment, before she might be able to resume her role as a parent. Thus, the juvenile court had before it sufficient evidence to determine that the mother was unable to properly parent the children at the time of the trial and that she would not be able to resume her parental duties for a least one additional year, and we can conclude that, in these cases, the juvenile

court could have determined that the children's need for permanency and stability had overcome the mother's right to additional time for rehabilitation. See Ex parte Bodie, [Ms. 1210248, Oct. 14, 2022] ___ So. 3d ___ (Ala. 2022) (reversing the determination of this court that a juvenile court had erred in concluding that the evidence clearly and convincingly established that a mother's circumstances were unlikely to change in the foreseeable future); M.E.P., 975 So. 2d at 375 (reversing a judgment denying a petition for the termination of parental rights of a father and a mother and stating that the "children … deserve a permanent placement instead of continued foster placement for a year or more while awaiting their parents' possible, but not certain, rehabilitation").

The mother next argues that DHR failed to present evidence demonstrating that termination of her parental rights to the children would secure permanency for them. As the mother points out, DHR presented no evidence indicating that either D.S. or M.S. had any identified adoptive resource or that adoption would be a likely outcome. The record reflects that D.S., who was just over eight years old at the

40

time of the trial, was autistic and suffered from a seizure disorder that required medication. Evans testified that M.S., who was five years old at the time of the trial, had been recently diagnosed as suffering from ADHD and had disrupted "several" foster-care placements because of her behavior, which is not described in the record. Thus, the evidence reflects that D.S. and M.S. are "special-needs children," as that term is defined in Ala. Admin. Code (Dep't of Hum. Res.), r. 660-5-22-.06, which addresses adoption subsidies offered to adoptive parents of children who are determined to have special needs. Specifically, both D.S. and M.S. were, at the time of the trial, age five or older. Ala. Admin. Code (Dep't of Hum. Res.), r. 660-5-22-.06(2)(a)2.(iv). In addition, D.S. and M.S. both suffer from a mental disability. Ala. Admin. Code (Dep't of Hum. Res.), r. 660-5-22-.06(2)(a)2.(i).

As the mother contends, the record contains evidence indicating that she had a bond with the children. We have stated that "'[i]f some less drastic alternative to termination of parental rights can be used that will simultaneously protect the children from parental harm and preserve the beneficial aspects of the family relationship, then a juvenile

41

court must explore whether that alternative can be successfully employed instead of terminating parental rights.'" T.W., ___ So. 3d at ___ (quoting T.D.K. v. L.A.W., 78 So. 3d 1006, 1011 (Ala. Civ. App. 2011)). We also recently reiterated in T.W. that, "before proceeding to terminate the parental rights of the parents of special-needs children, a juvenile court must consider whether the children will likely achieve permanency through adoption." ___ So. 3d at ___ . Moreover, we cautioned in T.W. that, "[i]n order for the juvenile court to consider [whether a special-needs child will likely achieve permanency through adoption], it [is] incumbent upon DHR to present clear and convincing evidence of the viability of adoption so that the juvenile court [can] make an informed evaluation and decision." Id. at ___.

We agree with the mother that the record in the present cases, much like the record in T.W., contains no evidence indicating that adoption is a likely or foreseeable outcome for either D.S. or M.S. The record contains conclusory statements from the caseworkers that adoption is in their best interest, but no testimony or documentary evidence supports the conclusion that either D.S. or M.S. will be able to

achieve permanency through adoption at any point, much less in the foreseeable future. Although DHR presented evidence indicating that M.S.'s foster parents had not yet determined whether they might be interested in adopting her, Evans admitted that those foster parents had served as foster parents for 24 years, a fact which indicates that they had not been involved in the foster-care system as a means to secure adoptive children. DHR presented no evidence indicating that finding an adoptive home for D.S. or M.S. would be likely or that DHR routinely secures adoptive homes for children over the age of five or for those who suffer from autism, seizure disorders, or ADHD. Without such evidence, we cannot affirm the judgments of the juvenile court terminating the parental rights of the mother to D.S. and M.S. in appeal numbers CL-2023-0035 and CL-2023-0033, respectively.[3] See T.W., ___ So. 3d at ___.

---

[3]Our reversal of the judgments terminating the mother's parental rights to the children does not foreclose DHR from again seeking termination of the mother's parental rights

"if the mother's or [the children's] circumstances change and if other evidence develops regarding [the children's] best

43

CL-2023-0033; CL-2023-0034; CL-2023-0035; CL-2023-0036; CL-2023-0057; and CL-2023-0058

### III. The Father's Appeals in Appeal Numbers CL-2023-0057 and CL-2023-0058

As noted above, the father appeals from the judgments entered in case number JU-18-1195.02 and in case number JU-18-1197.02 terminating his parental rights to D.S. and to M.S., respectively. In his brief on appeal, the father advances the same basic arguments as the mother, but he also contends that the holding in T.W. mandates reversal of the judgments terminating his parental rights to D.S. and to M.S. For the reason we have reversed the judgments terminating the parental rights of the mother to D.S. and to M.S. in case number JU-18-1195.02 and case number JU-18-1197.02, respectively, those same judgments are also reversed insofar as they terminate the parental rights of the father.

---

interests …. See L.M. v. Shelby Cty. Dep't of Human Res., 86 So. 3d 377, 381-84 (Ala. Civ. App. 2011) (explaining that consideration of evidence existing at the time an initial petition for a termination of parental rights is denied is not barred by the doctrine of res judicata so long as the subsequent termination-of-parental-rights action is also based on new evidence of changes, or a lack thereof, in circumstances)."

T.N. v. Covington Cnty. Dep't of Hum. Res., 297 So. 3d 1200, 1221 n.10 (Ala. Civ. App. 2019).

44

CL-2023-0033; CL-2023-0034; CL-2023-0035; CL-2023-0036; CL-2023-0057; and CL-2023-0058

CL-2023-0033 -- REVERSED AND REMANDED.

CL-2023-0034 -- APPEAL DISMISSED.

CL-2023-0035 -- REVERSED AND REMANDED.

CL-2023-0036 -- APPEAL DISMISSED.

Moore, Hanson, and Fridy, JJ., concur.

Thompson, P.J., concurs in the result, without opinion.

CL-2023-0057 -- REVERSED AND REMANDED.

CL-2023-0058 -- REVERSED AND REMANDED.

Thompson, P.J., and Moore, Hanson, and Fridy, JJ., concur.